In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-23-00108-CV
_____

### IN THE INTEREST OF C.G.G.

═══════════════════════════════════════

**On Appeal from the 1A District Court**
**Tyler County, Texas**
**Trial Cause No. 25,800**

═══════════════════════════════════════

### MEMORANDUM OPINION

Mother appeals the termination of her parental rights to Cade.[1,2] In three issues

on appeal, Mother argues the evidence is legally and factually insufficient to

---

[1] The child's father did not file an appeal.

[2] We refer to the appellant as "Mother" and her child by a pseudonym to protect their identities. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

terminate her parental rights under sections 161.001(b)(1)(D), (E), and (P) of the Texas Family Code. Tex. Fam. Code Ann. § 161.00(b)(1)(D), (E), (P).[3] We affirm.

## I. Background

### A. Pretrial Proceedings

In September 2021, the Department of Family and Protective Services (the Department) filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. In its Affidavit in Support of Removal the Department alleged that on August 29, 2021, Mother gave birth to Cade, and that subsequently it received a report from the hospital, which according to the affidavit of removal states:

> Corbin tested positive for amphetamines and methamphetamine at birth and is currently in NICU due to withdrawals and being unable to eat properly. Mother, [ ], did not receive full prenatal care. Mother and child both tested positive at birth for methamphetamine and amphetamines in their urine. Mother also tested positive for buprenorphine.[4]

---

[3] Mother does not challenge the trial court's finding that termination of her parental rights was in the child's best interest. *See* Tex. Fam. Code. Ann. § 161.002(b)(2).

[4] The trial court took judicial notice of its file, specifically all orders within the file, "as to the parents' respective service plans, excepting any and all hearsay in both plans." "The record does not reflect that the affidavit of removal was offered into evidence at trial or judicially noticed by the trial court. Nevertheless, because it was evidence that could have been considered by the trial court in support of its finding that [the child] was removed based on abuse or neglect ... we include it for the purpose of providing background and context for this opinion." *In re K.N.D.*, No. 01-12-00584-CV, 2014 WL 3970642, at *2 n.2 (Tex. App.—Houston [1st Dist.] Aug. 14, 2014, no pet.) (mem. op. on reh'g) (citing *In re E.C.R.*, 402 S.W.3d 239, 240–41 (Tex. 2013)).

The Department's affidavit also states that Mother admitted injecting methamphetamines while she was pregnant with Cade. The Department noted that Mother was prescribed buprenorphine for past methamphetamine use. Finally, the Department alleged that Mother told the caseworker that Cade "is not withdrawing from Methamphetamine use because people do not withdraw from methamphetamine use." The NICU nurse stated that Cade was suffering from methamphetamine withdrawals.

On September 15, 2021, the trial court signed an Order for Protection of a Child in an Emergency and Notice of Hearing, granting the Department temporary sole managing conservatorship of Cade.

**B. Evidence at Trial**

In March 2023, the trial court held a one-day bench trial. Mother appeared with her attorney and announced ready for trial.

**1. Caseworker Jasmine Lyons**

Jasmine Lyons testified that she is the Department caseworker for this case. According to Lyons, Mother admitted to heroin use at the beginning of the case. She stated that, after Cade was removed from Mother's custody, the Department created a service plan for Mother that was signed and filed with the trial court. She testified Mother understood the requirements under her service plan to have Cade returned to her care. The service plan required Mother to obtain and maintain housing, obtain

3

and maintain a source of income, have a transportation plan, take parenting classes, undergo random drug testing, complete an ADAC assessment or substance abuse assessment, address her physical health, and "follow all general rules and guidelines[.]" Of the assigned tasks under the service plan, Mother did complete some requirements including providing a home address, which the caseworker notes was not verified before trial, and some proof of income. Before that time, Mother had provided partial address information or stated that she was living in a motel. For the proof of income, Mother provided an unemployment check from Massachusetts, but Massachusetts could not verify the information provided, and the caseworker did not verify that Mother ever worked in Massachusetts. Mother also completed her psychosocial evaluation but was discharged from the recommended counseling due to lack of participation.

Lyons agreed that because drugs were a concern when Cade entered the Department's care, it was very important for Mother to address any drug usage. Mother went to a residential treatment center based on the recommendation that she receive drug treatment. The caseworker received no complaints about Mother's behavior at this treatment center until she left the center. Lyons described the feedback from the treatment center as "positive[,]" testifying that Mother was constantly improving. But Mother was allowed a home visit and informed Lyons that she was discharged after the home visit for "[i]ssues with staff." After leaving

4

the residential treatment facility, Lyons discussed with Mother about going into another ADAC assessment program, but Mother never did enter another program. Lyons testified that Mother never told her that she was attending any Narcotics Anonymous meetings or Alcoholic Anonymous meetings. Lyons testified that, as of November 2021, she requested that Mother provide the Department with two drug tests a month. She testified the requirement remained in place through the trial. However, Mother didn't comply with the requirements, appeared intermittently, and completed just three months of drug testing with a positive drug-test result in December 2022. When informed of the December 2022 test result, Mother asked whether "the levels [were] lower?"

Lyons testified that visits between Mother and Cade were appropriate and that it was clear she loves her child. Lyons testified that, in her opinion, it would be a danger to Cade's physical health or safety were he to be returned to Mother. Lyon also testified, based on the concerns that existed about Mother's drug use and how it would affect Cade, Mother's parental rights should be terminated.

### 2. Dr. Anisha Amin

Dr. Anisha Amin testified that she is a licensed psychologist. Dr. Amin performed a psychological evaluation on Mother which included a clinical interview, IQ test, and achievement testing. Dr. Amin's explained her evaluation involved a complete survey of Mother's personality and emotional functioning as it

relates to Mother's mental status. For instance, Dr. Amin testified that a true and false survey that Mother completed showed that Mother, according to Dr. Amin, was not "really forthcoming about her shortcomings or any problems that she had."

Based on the tests Dr. Amin gave Mother, the records she reviewed, and Mother's clinical interview, Dr. Amin concluded that Mother has a "definite mood disorder, depression, anxiety, PTSD based on her history, drug abuse, borderline intellectual functioning, and an unspecified personality disorder." Noting Mother's drug use in particular, Amin explained that Mother uses drugs to "heighten" her mood disorders, which come in "valleys and mountains." Amin stated that Mother is using the drugs to elevate her senses, either creating a "euphoric feeling" or using them to "bring it back down." During the evaluation, when asked why Cade was removed from her care, Mother told Amin that Cade was born with drugs in his system and that Mother tested positive for drugs as well. Based on her evaluation, Amin explained that Mother has not had any long-term psychiatric care, has not been to a long-term sobriety residence, is not financially stable, and does not have structure to have a regimen, which Dr. Amin explained is important, along with sobriety, to "rear that child appropriately."

Dr. Amin also testified Mother failed to recognize her need for sobriety and failed to recognize she needed a change in her lifestyle. According to Dr. Amin, Mother's recognition of the problem as a problem is important, along with sobriety,

6

in creating the structure required for a child. "In other words, you don't recognize that there's a problem with your lifestyle[,] it continues[,] [a]nd unfortunately, in this case a child had to be removed because of that lack of understanding." Amin testified that although no individual aspect of this evaluation could deter someone from being a good parent, it is the "conglomeration of all these aspects that are concerning."

### 3. Candice Webster

Candice Webster testified that she is a licensed chemical dependency counselor and is employed as the lead counselor for Santa Maria Hostel. She explained that Santa Maria is a state funded residential treatment center for women with substance abuse or co-occurring disorders. Webster was one of Mother's primary counselors when she entered Santa Maria in August 2022. She stated that most women enter the treatment program in an intensive level program, requiring more group hours and sessions with their primary counselor. Once a patient achieves stability, they move over to a supportive level care, which would require fewer group sessions and individual sessions. Mother entered Santa Maria in an intensive level of support. Webster stated that when Mother was at Santa Maria, "[s]he was doing great[,] … making great progress." She explained that Mother was acting as a mentor in the program and she had been able to process her substance abuse history and trauma within the program. Due to this progress, Mother was allowed to have a home pass to visit her family. This pass allowed Mother to leave for the day with specified

times to leave and return to Santa Maria. Mother reported to the facility after her allotted time. According to Webster, Mother then chose to leave the facility. Webster has had no contact with Mother since she left Santa Maria. If Mother wanted to return to Santa Maria within twenty-four hours, and if her caseworker was unavailable, she could have reached out to Webster or the program director at Santa Maria. Webster confirmed that Mother did not reach out to them after her departure.

### 4. Mother

Mother testified that her son was removed from her care because they both tested positive for drugs at his birth. Mother first denied using drugs during her pregnancy, but later admitted she used heroin until she found out she was pregnant. Mother stated that when she found out she was pregnant, she contacted a doctor through an online service and was prescribed Suboxone for her long-term heroin addiction. Mother said she started using the Suboxone because she believed she "could possibly die[]" if she stopped taking heroin suddenly. Mother did not understand why Cade would have methamphetamines in his system at birth. She denied using methamphetamines, contending that all she took was her Suboxone, three times a day as prescribed. She explained that she "recreationally used meth" before she was pregnant, but "heroin was my problem." Mother testified she was surprised a drug test she took after her son was removed was positive, stating, "I haven't done any meth. I don't – I'm a heroin addict, not a meth addict.

8

According to Mother, she entered Santa Maria due to her heroin addiction. Mother denied arriving late to Santa Maria after her day pass or that she took a drug test when she finally arrived back at Santa Maria. Mother stated she left because she was not satisfied with the level of care she was receiving from Santa Maria. Mother admitted she lied when she appeared before the trial court previously and stated that she was doing well at Santa Maria and liked the program. Mother does not think she needs inpatient therapy for her drug addiction, stating that she could have used "outpatient and go to NA meetings and stuff like that[.]" After she left Santa Maria, Mother said she contacted some outpatient resources, but did not follow through with any treatment. She testified that she did attend NA meetings in Houston but could not provide documentation of her attendance because it is "anonymous." Mother gave various reasons as to why she missed drug tests requested by the Department, including lack of transportation, working out of town, psychological and health issues. She confirmed that after she left Santa Maria, she took a drug test in December 2022 and her "levels were high…[for] meth." Mother again denied using methamphetamines, stating "that isn't what was the problem." During cross-examination, Mother maintained that she has not used drugs since she "had her son." When questioned as to why she posted a social media message after leaving Santa Maria stating, "fresh out of rehab, 90 days sober[,]" Mother testified that she did not

tell the truth on Facebook, but later admitted that she relapsed on heroin the day before she was admitted to Santa Maria.

Mother stated that currently she is living with her grandmother in Cleveland. Her grandmother and her extended family will be a support system for her and Cade. She said she is receiving $1,015 a week in unemployment benefits, explaining the last time she was employed was before she entered treatment at Santa Maria. Mother confirmed that she has fifteen weeks of unemployment left, but she is "actively" seeking employment for when her benefits "run out." Mother stated that she is now seeing a psychiatrist and is getting prescribed medication to help with her moods, blood pressure and anxiety. According to Mother, she started taking the medications while at Santa Maria, and continued to see a psychiatrist and take the medications after she left the facility. Mother stated that she has continued to work her service plan, including taking a parenting class that she completed a month before the trial. Mother confirmed that she attends her visitations with her child, stating she brings him age-appropriate toys and rarely misses visitation.

### 5. Foster Mother

Foster Mother is a NICU nurse who "take[s] care of drug-exposed babies." She has had Cade in her care since he was two weeks old. She stated that Cade is nineteen months old and has no medical issues. She described Cade's demeanor as an infant, testifying that he "cried a lot[,] [t]here [were] times where we had long –

we had to comfort him quite frequently," and that it was "pretty hard the first six months." She confirmed this behavior is a withdrawal symptom of infants exposed to drugs in utero. She testified that if Mother's parental rights were to be terminated, she and her family would want to adopt Cade.

At the conclusion of testimony, the trial court terminated Mother's parental rights to Cade. Mother timely appealed.

## II. Mother's First, Second, and Third Issues

In Mother's first, second and third issues she challenges the sufficiency of evidence to support termination under section 161.001(b)(1)(D), (E), and (P). Texas Family Code Ann. § 161.001(b)(1)(D), (E), (P).

### A. Standard of Review

Under legal sufficiency review, we review "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id*. If no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id*.

Under factual sufficiency review, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id*. We give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its ruling. *Id*. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id*.

The decision to terminate parental rights must be supported by clear and convincing evidence, i.e., "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2); *see also In re J.L.*, 163 S.W.3d at 84. We will affirm a judgment if any one of the grounds is supported by legally and factually sufficient evidence and the best interest finding is also supported by legally and factually sufficient evidence. *In re C.A.C., Jr.,* 2011 WL 1744139, at *1. However, when, as here, a parent challenges a trial court's findings under section

12

161.001(b)(1)(D) or (E), we must review the sufficiency of those grounds as a matter of due process and due course of law. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019).

Section 161.001(b)(1)(D) of the Family Code allows for termination of a parent's rights if the trier of fact finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Section 161.001(b)(1)(E) allows for termination if the trier of fact finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E). "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citations omitted). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.S.*, 662 S.W.3d 620, 629 (Tex. App.—Beaumont 2023, pet. denied) (quoting *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)) (other citations omitted).

Termination under subsection (E) must be based on more than a single act or omission and requires a voluntary, deliberate, and conscious course of conduct by

13

the parent. *In re M.S.*, 662 S.W.3d at 629; *In re M.L.L.,* 573 S.W.3d 353, 363-64 (Tex. App.—El Paso 2019, no pet.). A parent's conduct that subjects a child's life to instability and uncertainty endangers the emotional or physical well-being of a child. *In re M.L.L.*, 573 S.W.3d 353 at 363. Endangerment is not limited to actions directed toward the child and includes the parent's actions before the child's birth and while the parent had custody of older children, including evidence of drug usage. *In re J.O.A.,* 283 S.W.3d at 345. Courts may consider whether a parent's drug use continues after the child is removed from the parent's care, as such conduct shows a voluntary, deliberate, and conscious course of conduct that endangers a child's well-being. *In re H.S.*, No. 09-23-00002-CV, 2023 Tex. App. LEXIS 4191, at *21 (Tex. App.—Beaumont, June 15, 2023, no pet.) (mem. op.).

**B. Section 161.001(b)(1)(D), (E)**

The trial court heard evidence about Mother's drug use, that both she and Cade tested positive for drugs after she gave birth, and, although Mother admitted she was a long-time drug user, she denied using drugs after she found out she was pregnant with Cade. The caseworker testified that even though Mother was ordered to go to drug testing at least once a month, she completed only three drug tests throughout the pendency of the case. Evidence also showed that about three months before trial, one drug test was positive for methamphetamines, although Mother disputed those results, saying methamphetamines is not her drug of choice. Mother maintained that

14

she has continuously refrained from drug use since she found out she was pregnant with Cade. But Mother did admit that she also relapsed on heroin before she entered Santa Maria. There was also testimony about Mother's psychological issues, her inability to acknowledge her drug issues, and her failure to effectively treat her drug addictions by either staying at her inpatient facility or providing the Department with proof of attendance at outpatient facilities. Evidence showed that Mother provided proof of unemployment income, but the Department could not confirm the information Mother provided with the State of Massachusetts. Finally, while there was testimony that Mother was working her service plan, and that she regularly visited Cade and maintained a positive relationship with her child, the trial court, as the factfinder, was entitled to weigh that evidence against the evidence of Mother's continued drug use and inability to acknowledge or seek adequate treatment for her drug use. *See In re J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."); *In re J.A.V.*, 632 S.W.3d 121, 131 (Tex. App.—El Paso 2021, no pet.) ("testimony regarding Mother's continued drug use, coupled with Child's at-birth addiction to opiates as the result of Mother's use of illegal drugs during pregnancy, would further bolster an inference that Mother's drug use continued to endanger Child by affecting Mother's ability to parent."). The trial court may infer from refusals to drug test that the parent is

continuing to use drugs. *See In re M.S.*, 662 S.W.3d 620 at 629*; In re H.S.*, 2023 Tex. App. LEXUS 4191, at \*21; *In re J.H.*, No. 07-17-00307-CV, 2017 WL 6459537, at \*4 (Tex. App.—Amarillo Dec. 11, 2017, pet. denied) (mem. op.) (noting a parent's failure to complete their service plan can be considered in an endangerment finding, including failing to provide proof of employment and safe and stable housing); *In re R.M.*, No. 12-21-00099-CV, 2021 WL 4898460, at \*4 (Tex. App.—Tyler Oct. 20, 2021, pet denied) (mem. op.) ("A parent's drug use both before and after a child's birth is relevant to the issue of endangerment."); *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.) ("The trial court could reasonably infer [Mother] avoided taking the drug tests because she was using drugs.").

Therefore, viewing the evidence in the light most favorable to the trial judge's findings, we conclude that the trial judge could reasonably have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed Cade to remain in conditions or surroundings which endangered his physical or emotional well-being and engaged in conduct or knowingly placed Cade with persons who engaged in conduct that endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *See also In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *In re M.L.L.*, 573 S.W.3d at 363; *In re J.O.A.*, 283 S.W.3d at 345; *In re M.R.J.M.*, 280 S.W.3d at 502; *In re J.T.G.*, 121

S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *In re J.F.C.,* 96 S.W.3d at 266.

Having concluded that the evidence was legally and factually sufficient to support the trial court's findings as to subsection 161.001(b)(1)(E), we need not address Mother's challenges regarding the trial court's findings under sections 161.001(b)(1)(P). *See In re N.G.*, 577 S.W.3d at 235; *In re C.A.C., Jr.*, 2011 WL 1744139, at *5; *see also* Tex. R. App. P. 47.1 We overrule Mother's first, second, and third issues on appeal.

### III. Conclusion

Having overruled all of Mother's issues on appeal, we affirm the order of the trial court terminating her parental rights and appointing the Department as sole managing conservator of Cade.

AFFRIMED.

JAY WRIGHT
Justice

Submitted on July 5, 2023
Opinion Delivered September 21, 2023

Before Horton, Johnson and Wright, JJ.

17